Filed 4/7/14  P. v. Ward CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B243600 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA358364) |
| LAMONT WARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Kenneth C. Byrne and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Lamont Ward of the first degree murders of Tommie Hayes and Kevin Cohen (Pen. Code, § 187, subd. (a)),[1] and found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and murder for financial gain (§ 190.2, subd. (a)(1)).[2] Defendant was sentenced to two consecutive terms of life in prison without parole. He appeals from the judgment of conviction, contending: (1) his attorney was ineffective for failing to move to suppress his confession; (2) the evidence was insufficient to support the defendant's conviction in the killing of Kevin Cohen; (3) the trial court erred by instructing on the doctrine of transferred intent; and (4) his attorney was ineffective for failing to object to certain comments by the prosecutor in argument. We disagree with these contentions and affirm the judgment.

## BACKGROUND

*The Killings*

Shortly before 5:00 a.m. on April 12, 2009 (Easter Sunday), Tommie Hayes and Kevin Cohen were shot to death at the Lamp Lodge, a hotel frequented by transients on Stanford Avenue between 6th and 7th Streets in the skid row area of Los Angeles. When police arrived, they found Hayes, a security guard at the hotel who also sold drugs there, lying dead on the floor of the television room. They

---

[1] All undesignated section references are to the Penal Code.

[2] Defendant was tried jointly with Richard Luna before a separate jury. Defendant's jury alone heard statements defendant made confessing to the murders. Shanana Flores, who was also charged with the murders, pled guilty to voluntary manslaughter before trial and testified against defendant and Luna in exchange for a 12-year sentence. We affirmed Luna's judgment of conviction in a separate appeal, B244484. In this appeal by defendant, we take our summary of the evidence at trial from our opinion in Luna's case, supplemented by the evidence that was heard by defendant's jury alone.

found Cohen, who apparently was visiting, lying in the parking lot. Hayes had been shot eight times, with entry wounds in his chin, right side (two wounds), back (four wounds) and left buttock. Three 9-millimeter or larger caliber slugs were later recovered from his body. Cohen had been shot once, the entry wound being in the left hip, the bullet exiting through his upper right chest.

In the television room, police recovered nine .9 millimeter shell casings (all later determined to have been ejected from the same gun) and five bullets. They also observed several bullet holes in a couch. A window of the television room was broken, and broken glass lay around Cohen's body in the parking lot, suggesting that he had been shot in the television room and jumped through the window to escape.

*Shanana Flores' Testimony*

Shanana Flores, an accomplice in the murders (see fn. 2, *ante*), described the circumstances surrounding the killings. She testified that she and her girlfriend, Maria, frequented the Lamp Lodge where she and others sold drugs for defendant. Tommie Hayes ran his own drug business there in competition with defendant.

A couple of days before the murders, defendant and Hayes argued over their drug dealing. Defendant told Hayes that the Lamp Lodge was defendant's building, that they were going to have to fight over it, and that one of them "needed to be taken out."

The night before the killings, Flores became upset with Hayes because he was giving Maria heroin in exchange for selling crack cocaine. Flores ran into defendant outside the Lamp Lodge and gave him a ride in her truck. Defendant was on the phone and told her that he was "having a conversation with [one of his] boys," and that he was "tired of Tommie's shit" and "need[ed] to get rid of him."

3

He expressed dissatisfaction with "his boys," and asked Flores if she knew anyone who would sell a gun. Flores said yes, remembering having met Richard Luna a month or so earlier at a party, where he displayed a ".9 Glock" handgun and told her, "Just call me. I'll do anything."

Flores dropped defendant off at the Lamp Lodge. Later, defendant called and asked "what's up with your boy?" Flores called Luna, picked him up at his house, and drove toward the Lamp Lodge. Defendant called Flores and she told him that Luna was with her. Flores then acted as the conduit between defendant on the phone and Luna in the car. Luna asked to buy defendant's gun, but defendant said that he did not want to sell it. Defendant asked if Luna would "do the job?" Luna asked what was in it for him. Defendant offered "anything that is on the body." Luna said he wanted additional money as well. Defendant offered $3,000 to $5,000. Luna agreed.

Around 4:32 a.m. (as indicated by a security video from a nearby building played at trial), Flores and Luna arrived at the Lamp Lodge. Flores parked nearby, and she and Luna smoked some methamphetamine. Flores was in phone contact with defendant, who told her to drop Luna off in the middle of the block on Stanford. After Luna exited her vehicle, Flores drove around the block and parked on 7th Street as instructed by defendant.

A few minutes later, Luna returned, angry that defendant had not arranged things for the killing. Luna complained that "the guy," referring to Hayes, was not outside, and that "Mesquito," referring to a resident of the Lamp Lodge named David Amezquita who sold drugs for Hayes, had seen him pull out a gun. Luna said that he was not leaving until he did what he had to do and killed Hayes. At Luna's direction, Flores called defendant, who promised to "get this right." While on the phone with defendant, Flores heard him tell "Jeff," the manager of the Lamp

4

Lodge, to turn off the television monitor and open the door so that Luna could enter. She also heard him tell Amezquita and other residents to go to their rooms.

Luna left Flores parked on 7th Street and walked toward the Lamp Lodge. Shortly thereafter, Flores heard "a lot" of gunshots. Luna returned to Flores' truck. He was angry and said that "nothing was fucking right. Everything was messed up." He complained that he had gotten no money from the body. He struck Flores in the face, and told her that she needed to get him his money or that "the same thing" could happen to her children. Flores and Luna then drove off.

Flores called defendant and told him that she needed to give Luna some money. She dropped Luna off at his residence in Boyle Heights, and drove to defendant's house. Defendant gave Flores about $500. She drove to Luna's house and gave him the money. Luna said that it was not enough. He also demanded to go somewhere to "cash the money," because he did not want to carry around so many bills. Flores took him to PLS Check Cashers, where Luna exchanged the cash for a money order.

A couple of days later, Luna demanded more money from Flores. Defendant had no more money, so he gave Flores drugs to sell. She raised $200, which she gave to Luna.

*Other Testimony and Evidence*

A surveillance video spanning 4:31 to 5:00 a.m. on the morning of the killing, taken from the area of the Lamp Lodge, was played for the jury. As narrated by Flores, the video showed her dropping Luna off mid-block as directed by defendant, Luna walking toward the Lamp Lodge the first time and then returning to Flores' vehicle, Luna later meeting defendant outside the Lamp Lodge

5

after defendant tried to clear out bystanders, defendant's car leaving the scene after the shooting, and Luna walking down 7th Street back to Flores' vehicle.

On the morning of the killings, Renell Collins was in room 103 at the Lamp Lodge.[3] Defendant entered and said, "You might want to get your shit out of here . . . because some shit about to go down. . . . Tommie might be about to get his due." When Collins went outside, he saw Hayes sitting on the stairs. He saw defendant exit the Lamp Lodge and talk on his phone. Defendant told Collins to get Amezquita, who was standing in front of the Lamp Lodge, out of the area. Collins called to Amezquita, who joined him, and Hayes went inside the hotel. Collins heard 7 to 10 gunshots, and saw Cohen dive out a window and land in the parking lot. A short Hispanic man in a hoodie exited the front door of the hotel and walked on Stanford toward 7th Street. Collins later selected Luna's photographs in a six-pack as looking similar to the man.

Before the killings, William Bird was waiting across the street from the Lamp Lodge to buy crack cocaine from Hayes.[4] He saw two Hispanic men, the shorter of whom he identified as Luna, walk to the Lamp Lodge. Luna wore dark clothes, a hooded sweatshirt, and a beanie. A Caucasian man exited the Lamp Lodge, and talked to Luna and the other man, and then let them in. Bird then heard multiple gunshots, and saw Luna and the other Mexican man exit the Lamp Lodge and walk fast down 7th Street.

Nadia Chavez, the manager of the PLS Check Cashers where Flores took Luna after the killings, testified that a man, whom she identified as Luna, and a

---

[3] Collins was unavailable at trial and his preliminary hearing testimony was read to the jury.

[4] Bird was unavailable at trial and his preliminary hearing testimony was read to the jury.

6

woman entered the business around 7:00 a.m. on the morning of the murders. Luna wanted to exchange small bills for large bills, but Chavez told him he could not do that. She suggested that he get a money order instead. Luna purchased a $500 money order. He returned later that day and cashed the money order.

Cell phone records showed five calls between Flores' and Luna's phones on the morning of the murder between 3:59 a.m. and 4:23 a.m. Based on signals from directional towers, Flores' phone was moving from Boyle Heights (where Luna lived) toward the Lamp Lodge. There were calls between Flores' phone and defendant's phone at the following a.m. hours: 4:23, 4:34, 4:40, 4:46, 4:47, 4:49, and 4:57. In the first three calls, defendant's phone alone was near the Lamp Lodge; in the rest, both defendant's and Flores' phones were in that area.

At 5:00 a.m., defendant's phone made a call from a location further away from the Lamp Lodge, indicating that he was leaving the scene. Luna's phone made two calls at 5:03 and 5:09 a.m. from locations traveling away from the Lamp Lodge. At 5:38 and 5:40 a.m., Flores' phone called defendant's twice, then at 6:55 a.m. Flores' phone called Luna's.

*Recorded Calls Between Flores and Defendant*

After Flores was arrested, she cooperated with the police, who recorded five telephone calls she had with defendant before he was arrested. Defendant made several incriminating statements in the calls, and excerpts of the recordings were played for defendant's jury. In one conversation, when Flores complained that Luna was pressing her for money, defendant replied in part, "So what is he talking about? I mean, he done got like, what, about like $700 of money. You can't help it because he didn't find the money on the boy." In another conversation, Flores and defendant talked about having hired Luna after, as stated by defendant, "I was

7

getting ready to do something and my people was taking like . . . too long." Defendant and Flores discussed having expected a "jack move," and defendant stated how he expected that Hayes would reveal where he hid his money on his person: "Because when a mother fucker in a situation like that, . . . [t]hey going to give it up, . . . they going to tell you where it is." They also discussed not knowing that Hayes would be killed. Defendant explained, "[I]t's not our fault [that Hayes didn't give up his money]. . . . My thing was (inaudible) in the pocket. Okay. Because that's where I seen him putting it. And now, I didn't know he was putting it in his nuts and in his butt and in his ankles and taping it and all of that shit. . . . [I]f I had known that, I had [*sic*] told him there." Referring to Luna killing Hayes, defendant stated: "So, you know, I mean, he did what he did. . . . I ain't knocking what he did. It's done. You know what I'm saying? It's like . . . I ain't got no problem with . . . cleaning the rest of it up since it didn't go that way."

In yet another conversation, when told by Flores that Luna had told some "homies" "about the hit on . . . old boy," defendant replied, "What the fuck is he doing that for? That's stupid." Defendant suspected that "the bottom line is, you know, I guess he want his bread."

*Recorded Call Between Officer Ortiz and Defendant*

Posing as Luna, Los Angeles Police Officer Sergio Ortiz spoke with defendant by phone. The call was recorded and played for defendant's jury. In the call, Ortiz (as Luna) told defendant that he wanted more money because "you had me smoke this fat mother fucker [Hayes] and that . . . fucking maricon [Cohen] that was with him," for which he had received $700 through Flores. Defendant said that Flores had told him that Luna had agreed to $3,000. Ortiz (as Luna) stated "[y]ou got to see where I'm coming from. And it wasn't just one mother

8

fucker. It was two mother fuckers." Defendant replied, "I understand . . . but again the decision wasn't like that. . . . How did he [referring to Cohen] get there? He was . . . it wasn't agreed upon at first before it happened." Ortiz (as Luna) demanded $4,000 because "it wasn't just that fat mother fucker, it was that other gay mother fucker, too." Defendant agreed to "raise it to four" and to meet on the following Saturday for defendant to pay Luna an additional $3,300.

*Recorded Call and Meeting Between Flores and Luna*

The police also arranged for Flores to talk by phone to Luna, who was in custody, and recorded the conversation. Flores asked Luna how much "Q" (defendant's nickname) owed him. Luna replied, "whatever he feels on owing," and said, "[A]ll I'm asking for is to take care of me while I'm in here." Luna admitted that he already had been paid $700 and told Flores that he wanted additional money delivered to his mother's address. He asked Flores to "talk to him for me," and ask "if you can spare frickin' a thousand" as a partial payment.

The police also arranged for Flores to visit Luna in jail. A recording of their conversation was played at trial. In the conversation, Flores said that "Q" was "tripping" because Luna was in custody. Luna replied, "Oh, he thinks that." Flores responded, "Yeah." Luna then said, "No." Flores complained that she had told defendant that he still owed them money. Luna told Flores, "Just tell him he could send it . . . and put it on the books," referring to Luna's account at county jail.

*Defendant's Statements to Detectives Thacker and Lake*

Defendant was arrested on July 1, 2009. On that date, Los Angeles Police Detectives John Thacker and Thayer Lake interviewed him at the police station for

more than three hours.  The interview was recorded and played for defendant's jury.  After being advised of his rights, defendant agreed to talk to the Detectives. As here relevant, defendant initially denied knowing who shot Hayes and Cohen. Later, he admitted hiring Luna through Flores to "send a message" to Hayes. Defendant stated that he asked Flores if she knew anyone with a gun, but explained to the Detectives "that was talking shit, though. . . .  When he came down I was like, oh, shit.  What's going on?  And she was like, well, this is what's going on." He later reiterated that he did not expect Luna to have a gun.  Defendant admitted clearing people out of the Lamp Lodge, but denied he intended to have Hayes killed.  He stated:  "[H]e was coming down there to beat up Tommy and do whatever he needed to do to Tommy to send a message.  And my word was, beat up Tommy.  I said in the process, I said he might have some money on him. . . . She [Flores] asked me how much [because Flores told him that Luna wanted to know what he would get]?  I said . . . he probably got about $1,500, a $1,000 or something on him.  What she relayed to him later on, I found out, was that he was to go in there and he was going to get the money off of Tommy.  The shit went bad. I didn't know he was going up in there to kill Tommy.  All I knew was he was going up in there to send a message."  He admitted giving Flores $700 after the killings to give to Luna.

## DISCUSSION

*Ineffective Assistance of Counsel*

Defendant contends that his trial counsel was ineffective for:  (1) not moving to suppress the incriminating statements he made to Detectives Thacker and Lake on the ground that they were not voluntary, and (2) not objecting to the

10

prosecutor's comments on the natural and probable consequences doctrine. We disagree.

A. *The Statements to the Detectives*

To establish ineffective assistance of counsel on appeal, a defendant must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Ibid.*)

On direct appeal, a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission. (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Here, the record suggests a reasonable tactical purpose in not seeking to suppress defendant's incriminating statements to Detectives Thacker and Lake.

Apart from defendant's statements to the detectives, the evidence left no question that defendant hired Luna and that Luna intentionally, and with premeditation and deliberation, killed Hayes, and in the process also killed Cohen who happened to be present. The only question was whether defendant intended to have Hayes killed (as Flores testified) or whether he intended something less than that (to have Luna "send a message" to Hayes, short of killing him).

Defense counsel's strategy, as revealed by his closing argument, was to attack Shanna Flores' credibility, especially insofar as she testified that defendant set the plot in motion with the intent to kill Hayes. As defense counsel told the

11

jury, "this case is about Shanana Flores, her hatred, her desire for revenge [against Hayes for giving heroin to her girlfriend], and her getting my client into a web." According to defense counsel, it was Flores, not defendant, who wanted Hayes killed: "When I first read those reports about the eight shots in Tommie and saw that video, and during the course of this trial I could hear her in my mind telling Speedy [Luna], and [']when you do it, Speedy, Fuck him up.['] Eight shots will do that to you."

Thus, the record suggests defense counsel made the reasonable tactical decision not to object to defendant's statements to the detectives as a way of presenting defendant's full version of events – including that he wanted only to send Hayes a message and did not want him to be killed – without the need to call defendant to testify. Such a tactical decision made sense given that besides the interview with the detectives, defendant made other, similar incriminating statements in his recorded telephone calls with Flores and Officer Ortiz (who pretended to be Luna). Because the record demonstrates a rational basis for defense counsel not to object to the statements to the detectives, we reject the claim that defense counsel was ineffective.

In any event, even if defense counsel had successfully moved to exclude defendant's statements to the detectives, it is not reasonably probable that a different result would have been reached. As here relevant, the prosecution proceeded on three theories of aiding and abetting liability for first degree murder: (1) assuming that defendant intended to have Hayes killed, that he aided and abetted Luna in committing the premeditated murder of Hayes, and that under the doctrine of transferred intent he was also liable for Luna's killing of Cohen;[5]

---

[5] "[A] person's intent to kill the intended target is not 'used up' once it is employed to convict the person of murdering [the intended] target. It can also be used to convict of

12

(2) assuming that defendant intended only to have Hayes beaten or robbed, that he was guilty of first degree murder because the intentional killings were a natural and foreseeable consequence of the crimes defendant intended; and (3) assuming that defendant only intended to have Hayes robbed, that he was guilty under the felony murder rule because the killings occurred during the commission of attempted robbery.

The record leaves little doubt that the jury accepted Flores' version of events and concluded that defendant hired Luna to kill Hayes. Under the jury instructions for the financial gain special circumstance, the jury was required to find that "[t]he murder was intentional," "[i]t was carried out for financial gain," and "[t]he defendant believed the death of the victim would result in the desired financial gain." In finding the financial gain special circumstance true, the jury necessarily concluded that defendant intended to have Luna kill Hayes for defendant's own financial gain. Given that finding, it is very likely that the jury convicted defendant on the theory that he aided Luna in the premeditated murder of Hayes, and convicted him of the first degree murder of Cohen under the doctrine of transferred intent. It is thus extremely unlikely that defendant's statements to the detectives, in which he claimed to have wanted only to have Luna "send a message" to Hayes and did not intend to have Hayes killed, played a role in defendant's convictions. On this ground alone, it is not reasonably probable that that if defense counsel had successfully excluded defendant's statements to the detectives, a different result would have been reached.

---

the murder of others the person also killed." (*People v. Bland* (2002) 28 Cal.4th 313, 322.) "[A]ssuming legal causation, a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*Id.* at pp. 323-324.)

Moreover, the second two theories, which assumed that defendant did not intend to kill Hayes, but rather hired Luna to intimidate Hayes by, inter alia, robbing him, were based not simply on defendant's statements to the detectives, but also his statements made to Flores in their recorded conversations. Those statements were virtually identical in their incriminating effect to the statements defendant made to the detectives. Defendant and Flores discussed expecting Luna to beat or rob Hayes –a "jack move" – and did not expect Luna to kill him. Moreover, the other evidence of defendant's guilt connecting him to the hiring of Luna was nearly airtight. Thus, even if defense counsel had successfully moved to exclude defendant's statements to Detectives Thacker and Lake, the independent evidence, considered without reference to the statements, showed almost as a matter of law that even if defendant did not intend to have Hayes killed, he was, at the very least, guilty of first degree murders of Hayes and Cohen on a felony murder theory.

For these reasons, assuming that counsel was ineffective, it is not reasonably probable that but for counsel's deficiency, defendant would have achieved a better result.

B. *The Prosecutor's Argument*

Defendant contends that defense counsel was ineffective for failing to object to purported misstatements of the law by the prosecutor concerning the natural and probable consequences doctrine. The prosecutor argued, in relevant part: "did [defendant] just want Tommie [Hayes] beat up and shit went bad? Did he send an armed assassin in to do it? Seriously, he's got a guy with a gun, he sends him in, a shooting was reasonably foreseeable and [defendant] is guilty of first degree murder [in the killings of Hayes and Cohen]."

14

Defense counsel was not ineffective, because the prosecutor's comments were unobjectionable. "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citations.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.] [¶] "'[A]lthough variations in phrasing are found in decisions addressing the doctrine—"probable and natural," "natural and reasonable," and "reasonably foreseeable"—the ultimate factual question is one of foreseeability.' [Citation.] Thus, '"[a] natural and probable consequence is a foreseeable consequence". . . .' [Citation.] But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . ."' [Citations.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

Here, assuming that defendant hired Luna to confront Hayes by assaulting, beating, or robbing him, there was ample evidence to support first degree murder convictions in the deaths of Hayes and Cohen on a natural and probable consequence theory. Luna's premeditated killing of Hayes was a foreseeable consequence – defendant expected, at the very least, that Luna, armed with a gun,

15

would use force against Hayes and take money or drugs.  In that context, Hayes' possible death at Luna's hands was to be reasonably expected.

So, too, was Cohen's death.  The Stanford Hotel housed residents, and transients frequented the location.  Defendant arranged for Luna's confrontation with Hayes to occur in the lobby of the hotel.  Obviously, that a bystander might be present, despite an attempt by defendant to clear out witnesses, and that such a person might be harmed in the anticipated use of force against Hayes, was "a possible consequence which might reasonably have been contemplated."  (*People v. Medina, supra*, 46 Cal.4th at p. 920.)  That defendant attempted to clear out potential witnesses, and that he may even have believed he succeeded, does not mean that Cohen's death was not reasonably foreseeable.  The jury could infer, as a matter of common sense, that a  reasonable person in defendant's position would have understood the possibility that he might not be able to clear out all residents or transients, and the possibility that such a person might be killed during the anticipated attack with a gun on Hayes.  Thus, the evidence was sufficient to show that the killing of Cohen was a natural and probable consequence of the intended killing of Hayes.

In short, there was nothing improper in the prosecutor's arguments on the natural and probable consequences doctrine, and, indeed, the evidence supported defendant's convictions on that theory.

*Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to support his conviction of the murder of Kevin Cohen.  He is incorrect.  Viewing the record as a whole and in the light most favorable to the prosecution (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence supports the conviction.  We have already

16

discussed the sufficiency of the evidence to support the natural and probable consequences theory. Although we need discuss only one theory to uphold the conviction (*People v. Sanchez* (2001) 26 Cal.4th 834, 851), we now discuss the felony murder theory as well.

A defendant who aids and abets certain statutorily listed felonies, including attempted robbery, is guilty of first degree murder for a killing committed in the course of that attempted robbery, even if the killing is not a natural or probable consequence. (§ 189; *People v. Dillon* (1983) 34 Cal.3d 441, 477.) Here, at the very least, the evidence proved that in hiring Luna, defendant expected him to take money or drugs from Hayes. Defendant paved the way for Luna to confront Hayes in the lobby of the Stanford Hotel by, among other things, trying to clear out potential witnesses. Luna entered the hotel, intending to take money or drugs from Hayes, and soon after shot Hayes eight times and Cohen once. He then returned to Flores' vehicle and complained that he got no money from Hayes. This evidence was sufficient to prove that defendant aided and abetted Luna in the attempted robbery of Hayes, and that Luna killed Cohen while attempting to commit that robbery.

Defendant contends that there was no evidence that when Luna shot Cohen, the attempted robbery of Hayes was still in progress. The argument ignores the evidence that the killing of Cohen occurred simultaneously with the killing of Hayes. Thus, Renell Collins, who was standing outside the Stanford Hotel, heard 7 to 10 gunshots, and saw Cohen dive out a window and land in the parking lot. The obvious – indeed the only reasonable – inference was that Luna shot Cohen during his attempt to rob Hayes. Thus, the evidence was sufficient to support defendant's conviction of the first degree murder of Cohen on a felony murder theory.

17

*Transferred Intent*

Defendant contends that the trial court erred in instructing on transferred intent with respect to the killing of Cohen. He asserts that "there was not a scintilla of evidence . . . that Luna shot Cohen by mistake or while intending to shoot a different prospective victim." We disagree. The evidence was sufficient to infer that Luna intended to kill Hayes (he shot Hayes 8 times), and in the fusillade also killed Cohen (who was shot once and jumped out the lobby window). Thus, an instruction on the doctrine of transferred intent, under which "the intent to kill the intended target transfers to others also killed" (*Bland, supra,* 28 Cal.4th at p. 323; see fn. 5, *ante*), was appropriate.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.          MANELLA, J.

18